# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANDREW LONG, | ) |
| Petitioner, | ) ) ) |
| v. | ) No. 16-CV-09158 |
| RANDY PFISTER | ) ) Judge John J. Tharp, Jr. |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is petitioner Andrew Long's petition for a writ of habeas corpus under 22 U.S.C. § 2254. Long is in the midst of serving a 45-year sentence at Stateville Correctional Center for attempted first-degree murder of Michael Mays. His initial petition states three grounds for relief: ineffective assistance of trial counsel, insufficiency of State's evidence, and trial judge abuse of discretion. Upon filing his reply ("Traverse Motion"), the petitioner conceded that the second and third grounds are procedurally defaulted. Consequently, the only issue remaining before the Court is Long's claim of ineffective assistance of trial counsel. For the reasons detailed below, Long's petition is denied because he has not established that the Illinois Court of Appeals was unreasonable in affirming the dismissal of the defendant's postconviction petition.

## BACKGROUND

Following conviction by a jury, the Will County Circuit Court sentenced Long to 55 years in prison for attempted first-degree murder and aggravated battery with a firearm. Upon Long's direct appeal, the Third District Appellate Court vacated the conviction for aggravated battery per the one-act, one-crime doctrine and reduced the total sentence to 45 years. Long then sought postconviction relief for ineffective trial counsel, based in part on claims that his attorney did not interview two supporting witnesses: Long's mother and a friend. The trial court dismissed Long's

petition as frivolous or patently without merit and the appellate court affirmed. 2016 IL App (3d) 140221-U. The Supreme Court of Illinois denied Long's petition for leave to appeal. Long then timely filed his habeas petition in this Court.

At trial, Long did not dispute several of the key facts surrounding the night of the shooting. The chain of events began when three men met up: Long, Mays, and Lawless Hawk, who is Long's cousin and Mays's former coworker. The three men then drove to purchase drugs and liquor before heading back to Long's apartment, where they watched basketball, drank alcohol, and smoked marijuana. Hawk's fiancée also joined the men at the apartment at some point during the evening. It also is undisputed that while at the apartment, Hawk pulled out a .380-caliber handgun and showed it to Mays. There is disagreement, however, as to where the gun came from and to whom it belonged. Hawk claimed that he found the gun in Long's kitchen cabinet and that it belonged to the petitioner. He also reported that after showing the weapon to Mays, he put the gun on the couch in Long's apartment and left it there. In contrast, Long testified that he had never seen the gun before Hawk pulled it out of his pocket in the apartment.

At some point after Hawk displayed the gun, he left to drive his fiancée back to her home before returning to Long's apartment to give Mays a ride to (Mays') sister's home, which was only a short two-minute drive away. Hawk and Mays both testified that after Hawk's return shortly before 11:00 PM, the two of them left the apartment and got in Hawk's car. According to the two men, Long then came down shortly thereafter and got into the backseat of the car. Long, on the other hand, claimed that Mays and Hawk left without him between 10:30 and 10:40, and that his girlfriend picked him up five-to-ten minutes later and drove him to his parents' house. Long's girlfriend corroborated his account in her testimony.

Upon arriving at his sister's home, Mays was in the process of saying goodbye to Hawk and exiting the car when he was shot seven times, including three shots to the head and face. Mays fell back into the car, at which point Hawk rushed him to the hospital. Mays, who miraculously survived the shooting, managed to place a 911 call at 11:03 PM while en route to the hospital.

In their investigation of the shooting, investigators found two casings inside the car, a bullet lodged in the passenger door, and a bullet hole in the windshield with a trajectory consistent with a shot fired from the backseat. Investigators also found two more casings on the street outside of Mays's sister's home. All of the casings and the bullet recovered from the car proved to be .380-caliber, as were the bullets removed from Mays's body during surgery. Police searched Long's apartment and found two issues of *Guns and Ammo* magazine, but no guns or ammo.

At trial, Hawk and Mays both testified that Long was the shooter and got out of the car before Hawk sped away. The State argued that Long shot Mays in order to steal the drugs that the group had purchased earlier that evening. Long also testified and denied shooting Mays. Long also presented testimony of an analyst from Verizon Wireless who provided information about two calls that had been placed between Hawk's and Long's phones during the critical time period of the night in question. The first, initiated on Hawk's phone, took place at 10:55 p.m. with a duration of 28 seconds. The second, initiated on Long's phone, occurred at 11:01 and lasted for 20 seconds. Due to limitations in the type of data collected by Verizon, the expert could not determine whether the calls connected or were missed.

In his habeas petition, Long asserts that his trial counsel provided ineffective assistance because his attorney did not call Jason Collins or Katherine Harper, whom Long refers to as "alibi

witnesses," to testify. Pet'r's Traverse Mot., p. 1, ECF 29.[1] Collins, a friend of Long's who was employed at the time of the shooting as a security guard, submitted an affidavit stating that had he been called as a witness, he would have testified that the *Guns and Ammo* magazines found in Long's apartment belonged to him (Collins). Long argues that the prosecution used the presence of the magazines to paint him as a gun fanatic. Harper, the petitioner's mother, also submitted an affidavit indicating that she told Long's attorney that the periodicals belonged to Collins. In addition, Harper's affidavit also states that she informed the petitioner's attorney that she was in possession of her son's cell phone, which contained a call log that memorialized the 10:55 and 11:01 calls on the night of the shooting between that phone and the phone registered to Hawk. According to Harper, the phone's call log also indicated that the first call, the incoming call from Hawk's phone, connected and was not a missed call.

## DISCUSSION

### I. Standard of Review

Under 28 U.S.C. § 2254(d)(1)-(2), a federal court may grant a writ of habeas corpus to a petitioner incarcerated due to a state court judgment only if the applicable state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)-(2). In the context of claims of ineffective assistance of trial counsel, a petitioner must show first that counsel was deficient to the point of making mistakes significant enough to violate the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The petitioner must also then demonstrate that the deficiency "prejudiced the defense" to such an extent as to

---

[1] The pagination of the petitioner's traverse motion is sporadic and inconsistent. All references to page numbers therein correspond to the overall page number of the entire PDF document.

violate the petitioner's right to a fair trial. *Id.* As such, the key issue at hand is whether the Illinois Appellate Court's determination that Long's trial counsel provided constitutionally adequate representation was unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This reasonableness standard requires this Court to grant a significant amount of "deference and latitude" to the state court decision. *Id.* Moreover, because the petitioner here must overcome the "highly deferential" unreasonableness standards established under both § 2254(d) and *Strickland*, he faces an especially difficult burden requiring him to prove that there is not a single "reasonable argument" that his trial counsel satisfied the *Strickland* standard. *Id.* at 105. For the reasons detailed below, the petitioner has failed to meet that burden.

## II. Jason Collins's Proposed Testimony

Although Long argues that Collins's testimony would strengthen his "alibi," nothing in his friend's statement relates to Long's location or activities during the shooting. The post-conviction appellate court therefore reasoned that the testimony would have "served to corroborate defendant's testimony on only the very minor point that the gun periodicals found in defendant's apartment did not belong to defendant." State Ct. R., Ex. U, p. *4, ECF 32. The court further explained that the magazines were not a major part of the State's case, as illustrated by the fact that the prosecution did not mention them during closing argument and that Collins's ownership of the periodicals does nothing to negate the key physical evidence in the case.

The appellate court's assessment that Collins' testimony, had it been offered, would have had negligible effect on Long's trial was eminently reasonable. The petitioner's claim that the magazines helped the prosecution wrongly portray him as a gun fanatic is unpersuasive. To begin, the prosecutors did not, as Long asserts, paint Long as a gun fanatic; they made no such argument and didn't even mention the *Guns and Ammo* magazines in their closing arguments. What the State

5

focused the jury on, of course, was the undisputed evidence that there was a gun in Long's apartment on the night of the shooting and the substantial evidence that the gun belonged to Long and that he fired it. That evidence included testimony by both Hawk and Mays—neither of whom had any apparent motive to falsely implicate Long—that Long was the shooter and also included corroborating ballistics evidence indicating that the shooter was seated in the backseat. Even if Collins had testified to owning the magazines, the State's case would have been no different and no weaker. Indeed, a defense of "those weren't my magazines" would have served only to focus more attention on the fact that magazines of interest to gun enthusiasts were laying about Long's apartment. Had the defense called Collins to testify about his ownership of the magazines, he would undoubtedly have been cross-examined, making it much more likely that the State would have addressed the presence of the periodicals in Long's apartment during closing argument. In short: the evidence was strong; the magazines were an exceedingly minor piece of the State's case; and calling Collins to testify about them would not have diminished the State's case and may well have hurt Collins more than helped him. Consequently, Long's trial counsel's decision to refrain from calling Collins might reasonably be determined to not have been deficient at all, let alone deficient enough to prejudice the petitioner. A reasonable jurist, therefore, could find that Long had not satisfied the *Strickland* standard in his state court appeal.

**III.    Katherine Harper's Proposed Testimony**

The Illinois Court of Appeals was similarly reasonable in its determination that Long's claims regarding his mother's potential testimony also fell short of ineffective assistance under the *Strickland* standard. As discussed above, Harper's willingness to corroborate Collins's statement that the magazines did not belong to Long relates only to an issue of minor importance in the case; adding testimony about the presence of *Guns & Ammo* in Long's apartment would only have

highlighted that unhelpful fact. The issue of the petitioner's cell phone is more central to the case, but as the appellate court pointed out, there is nothing to suggest that Harper would have been able to testify to anything other than being in possession of the phone. Long has not alleged that Harper has any additional knowledge that would be pertinent to the case.

Long also contends that the phone's call log proves that he was not at the scene of the crime by showing that he answered and received the 10:55 p.m. call. Although this argument does relate to an alibi defense (unlike the claim about the *Guns and Ammo* magazines), it too is unpersuasive. As the Illinois appellate court observed, in its closing argument, the State explicitly addressed the possibility that this call connected. Indeed, the State's theory was that Long in fact received Hawk's call. As the State argued, that call coincided with Hawk returning to Long's apartment to pick up Mays after dropping off his fiancée. As the petitioner acknowledged, the doorbell to his apartment was broken and guests who wanted to be let in had to either call him or get his attention by some other means, like throwing a pebble at the window. Thus, the State posited that Hawk placed a short, 28-second call to Long at 10:55 to get back into the apartment before leaving a few minutes later for the short drive to Mays's sister's home. Then, according to the State, Long shot Mays sometime before 11:01, at which point he called Hawk to see what was happening after the car had driven away. Two minutes later, at 11:03, Mays placed the 911 call while on the way to the hospital. The State laid out this proposed timeline in its closing argument, which was apparently convincing enough for the jury to return a guilty verdict. More important for the case at the present stage, the inclusion of this proposed timeline means that the call log would not present any evidence that contradicted the State's case.[2] Once again, a reasonable jurist could have

---

[2] The petitioner also asserts in passing that the phone could have been used in conjunction with GPS location information to show that he was not at the scene of the shooting when it occurred. He does not, however, expand on this argument in any way other than providing this

7

concluded, as did the Illinois appellate court, that Long had not met his burden here in terms of the *Strickland* standard.

* * *

For the reasons stated above, Long's petition for a writ of habeas corpus, ECF No. 1, is denied. Because this is a final decision ending all proceedings before this Court, the petitioner is only entitled to an appeal if he obtains a certificate of appealability by showing denial of a constitutional right. 28 U.S.C. § 2253(c)(1). The Supreme Court has explained that that standard is governed by whether a petitioner can demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). Due to the fact that the petitioner has made no such demonstration here, the Court declines to issue a certificate of appealability.

Date: November 15, 2019

John J. Tharp, Jr.
United States District Judge

---

solitary, unsupported sentence; the petition provides no basis from which to conclude that any such evidence exists as to the phone's precise location when the call was received. Given that lack of development, as well as the fact that the defense at trial called an expert from Verizon Wireless to testify as to the relevant phone records, this argument does not meaningfully change the Court's analysis here.

8